IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LOUISE E. ROBINSON, : | |
|       Plaintiff, : | |
| : | |
| v. : | Civ. No. 16-3575 |
| : | |
| ALLSTATE PROPERTY & : | |
| CASUALTY INSURANCE CO. : | |
|       Defendant. : | |

**Diamond, J.**                                                                                          January 24, 2018

**M E M O R A N D U M**

In this coverage dispute, I must decide whether an insured can recover under a homeowners' policy for fire damage to her residence when her mentally disturbed husband—also an insured—intentionally set the fire. Because both the policy and the law preclude any recovery, I will dismiss the wife's breach of contract claim and grant summary judgment in the carrier's favor.

### I.     LEGAL STANDARDS – SUMMARY JUDGMENT

I may grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must initially show the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is material only if it could affect the result of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). I "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If I then determine that there is no genuine issue of material fact, summary judgment is appropriate. See Celotex, 477 U.S. at 322.

Summary judgment is appropriate where the moving party shows that there is an absence

of evidence to support the nonmoving party. See id. at 325. "A nonmoving party must adduce more than a mere scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings." Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (citing Liberty Lobby, 477 U.S. at 249, and Celotex, 477 U.S. at 325). Where a moving party identifies an absence of necessary evidence, the nonmoving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

## II. LEGAL STANDARDS – INTERPRETATION OF INSURANCE CONTRACTS

The Parties and I agree that the Policy at issue here is governed by Pennsylvania law, under which:

> the interpretation of a contract of insurance is a matter of law for the courts to decide. In interpreting an insurance contract, we must ascertain the intent of the parties as manifested by the language of the written agreement. When the policy language is clear and unambiguous, we will give effect to the language of the contract. However, where the policy language is ambiguous, it is to be construed in favor of the insured and against the insurer, the drafter of the agreement.

Allstate Prop. & Cas. Ins. Co. v. Squires, 667 F.3d 388, 391 (3d Cir. 2012) (citations and quotations omitted). "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" 401 Fourth St., Inc. v. Inv'rs Ins. Grp., 879 A.2d 166, 171 (Pa. 2005) (quoting Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)). The court should not consider isolated individual terms but should instead consider the entire contractual provision to determine the parties' intent. NorFab Corp. v. Travelers Indem. Co., 555 F. Supp. 2d 505, 509 (E.D. Pa. 2008).

Finally, in a coverage dispute, the insured must make a prima facie showing that her

2

claim is covered by the subject policy. State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009). If coverage is shown, the insurer must then establish that an exclusion applies. Id.

### III. PROCEDURAL HISTORY

Invoking diversity jurisdiction, on June 29, 2016, Plaintiff Louise Robinson sued Defendant Allstate Property & Casualty Insurance Co., alleging breach of contract, common law bad faith, and statutory bad faith. (Compl., Doc. No. 1); 28 U.S.C. § 1332. Allstate moved to dismiss the Complaint for failure to join an indispensable party, to dismiss the common law bad faith count as non-cognizable, and to strike some of Plaintiff's monetary claims. (Doc. No. 2.) I denied without prejudice Allstate's Motion to Dismiss the Complaint, dismissed Plaintiff's common law and statutory bad faith claims, and struck Plaintiff's claim for attorneys' fees. (Doc. No. 12.)

At the conclusion of discovery, the Parties cross-moved for summary judgment. (Doc. Nos. 46, 47.) Plaintiff also moved to reinstate her statutory bad faith claim. (Doc. No. 47.) The matter was fully briefed and I denied Plaintiff's motions for summary judgment and to reinstate her statutory bad faith claim. (Doc. Nos. 48, 49, 52, 58, 60, 61.) All that remains is Allstate's Motion for Summary Judgment on Plaintiff's breach of contract claim. (Doc. No. 46.)

### IV. FACTUAL BACKGROUND

I have resolved all disputes in Plaintiff's favor and construed the undisputed facts in the light most favorable to her. See Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

#### A. The Insurance Policy

Allstate issued the Policy insuring the Philadelphia home of Plaintiff and her husband,

Willie Robinson, both of whom are "named insureds." (Homeowners Policy 6, Doc. No. 46-4.) The Policy imposes "joint obligations on persons defined as an insured person," meaning that "the responsibilities, acts and failures to act of a person defined as an insured person will be binding upon another person defined as an insured person." (Id. at 34.)

The Policy provides, *inter alia*, "Dwelling Protection" and "Personal Property Protection"; both apply only to "sudden and accidental direct physical loss" to the property. (Id. at 36–39.) Allstate also included a provision common to almost all homeowners policies, excluding from both "Dwelling Protection" and "Personal Property Protection" loss caused by "intentional or criminal acts of or at the direction of any insured person, if the loss that occurs: a) may be reasonably expected to result from such acts; or b) is the intended result of such acts." (Id. at 45.)

### B. The Fire

On the morning of October 26, 2015, Plaintiff called 911 because she "want[ed] someone to get her husband," who was "armed with a torch." (Phila. Police Dep't, Incident History Details, Oct. 26, 2015, Doc. No. 46-5.) Plaintiff told the operator that she smelled kerosene and smoke and that the fire alarm was going off. (Id.) When the police arrived, "[Mr. Robinson] stated to police that he set the fire because 'his house is demonic and needs to be taken down.'" (Phila. Police Dep't, Complaint or Incident Report, Oct. 26, 2015, Doc. No. 46-7.) The police arrested Mr. Robinson. (Id.; Pl.'s Dep. 31:19–21, 33:18–21, Doc. No. 46-6.) The fire "caus[ed] moderate thermal, soot and smoke damage to the closet area[,] smoke and soot damage to the third floor." (Phila. Fire Dep't, Investigation Profile Report, Doc. No. 46-11.)

Plaintiff testified that on the morning of the fire, she saw her husband—then 85 years old—with a lighter (which she more frequently described as a lit torch). (Pl.'s Dep. 16:21–17:4;

4

Pl.'s Am. Opp'n to Def.'s Mot. Summ. J. 4, Doc. No. 60.) After Mr. Robinson went upstairs and Plaintiff smelled smoke, she went outside to call 911. (Pl.'s Dep. 25:5–14, 29:7–13.) She left the house to make the call because "[she] didn't want [her husband] to hear [her] calling 911" and "reporting somebody to come in on [him]." (Id. at 29:12–19.)

Mr. Robinson's admissions aside, the cause of the fire is undisputed. Plaintiff acknowledges that her husband set the fire. (Pl.'s Am. Opp'n to Def.'s Mot. Summ. J. 1 ("The 'intentional act' which Allstate purports the basis of the denial, was the result of medical issue [sic] suffered by co-insured, [Mr. Robinson.]").) Philadelphia Fire Marshal Eric Geiger determined that the fire "originate[d] on the third floor in the closet area . . . when an open flame [was] applied to available combustibles." (Phila. Fire Dep't, Investigation Profile Report, Doc. No. 46-11.) Plaintiff's expert John Lightbody concluded that "[t]he ignition source for the fire is identified as open flame from a plumber's torch. The cause of the fire is intentional . . . ." (Lightbody Investigation Report 9, Doc. No. 46-24.) Finally, Defendant's expert Arthur Czajkowski concluded that "the fire [was] caused by an open flame from a plumbers torch (Ignition Source) being applied to the clothing and other combustibles (First Item Ignited) stored in and around the third floor front bedroom closet." (Letter from Arthur Czajkowski to Allstate 5, Doc. No. 46-17) Mr. Czajkowski interviewed Plaintiff on November 3, 2015, when she told him that on the morning of the fire, she saw Mr. Robinson with a lit plumber's torch in his hand; after he went upstairs, she called 911. (Id. at 2.)

**C. Mr. Robinson**

Upon arresting him, the police took Mr. Robinson to the Albert Einstein Medical Center, where he underwent involuntary examination and treatment. (Phila. Police Dep't, Complaint or Incident Report, Oct. 26, 2015, Doc. No. 46-8); see also 50 Pa. Cons. Stat. § 7302. Plaintiff has

5

provided 1,100 pages of records from Einstein relating to her husband. (Pl.'s Am. Opp'n to Def.'s Mot. Summ. J., Ex. A., Doc. No. 60.)

An examination note made on October 27, 2015 (the day after the fire) provides that Mr. Robinson was suffering from "psychosis." (Id. at 81, Doc. No. 60-5.) Mr. Robinson told the medical staff: "I want it to burn . . . my house, my wife, everything . . . [e]verything is demonic, me, where I live, it's all demonic . . . I got a port where they can talk to me." (Id.) Dementia and acute psychosis are repeatedly noted in the Einstein records. (Id. at 89, 96, 108, 114.) Those records also indicate, however, that the doctors had come to no definite diagnosis. For instance, the admitting psychiatrist (whose deposition was not taken) wrote, *inter alia*, as follows: "We need more information from family regarding the [patient's] history, baseline functioning, and timeline to better ascertain if the cause of the [patient's] behavior is psychiatric in nature." (Id. at 83.)

Mr. Robinson was discharged from Einstein on November 11, 2015 and transferred to another inpatient facility. (Id. at 35; Pl.'s Am. Opp'n to Def.'s Mot. Summ. J. 10.) He passed away on January 16, 2016. (Cert. of Death, Jan. 20, 2016, Doc. No. 47, Ex. G.)

As I discuss below, Plaintiff has presented no expert report or deposition testimony respecting her husband's mental state. Rather, in contesting summary judgment, she relies entirely on the Einstein records.

**D. Insurance Claim and the Instant Suit**

On the day of the fire (which took place during the Policy's coverage period) Allstate received Plaintiff's claim for coverage. (First Notice of Loss Snapshot, Doc. No. 46-12.) Having retained expert Czajkowski to determine the fire's cause, Allstate made no coverage decision until it received his report.

6

Some two weeks later, Mr. Czajkowski informed Allstate that the fire "was the result of someone applying an open flame to available clothing and other combustibles [in Plaintiff's house]." (Letter from Arthur Czajkowski to Allstate 4, Doc. No. 46-17.) Allstate promptly issued to Plaintiff a reservation of rights letter, while it awaited advice from counsel. (Reservation of Rights Letter, Doc. No. 46-18.)

Approximately two weeks later, counsel advised Allstate that Plaintiff's claim was not covered. (Coverage Opinion, Doc. No. 46-21.) Acting on counsel's advice, a week later, Allstate issued to Plaintiff a letter denying coverage, concluding, *inter alia*, that the loss Plaintiff had sustained: 1) was not "accidental" within the meaning of Allstate's policy; and (2) was intentionally caused by the acts of an insured. (Letter from Allstate, Doc. No 46-23.)

On June 29, 2016, Plaintiff brought suit against Allstate. (Compl., Doc. No. 1.)

### V. DISCUSSION

In asking me to dismiss, Allstate argues, *inter alia*, that the damage to Plaintiff's home is not covered because: (1) the fire loss was not accidental; and (2) the fire was intentionally set by Mr. Robinson. Plaintiff responds that: (1) the fire, when viewed from her perspective, was accidental; and (2) Mr. Robinson did not set the fire intentionally because he was psychotic.

Because Plaintiff has not made a prima facie showing that coverage exists for the fire loss, I will grant summary judgment in Allstate's favor. In the alternative, I conclude that Allstate has shown that the loss is excluded because it resulted from an insured's intentional act.

#### A. The Absence of Medical Experts

Although both sides retained fire experts, neither has offered any expert medical evidence. Allstate argues vigorously that without expert opinion testimony, as a matter of law Plaintiff cannot show that her husband's mental illness precluded him from committing an

intentional act.  (See Def.'s Mot. Summ. J. 26, Doc. No. 46 ("The Plaintiff has not retained any expert who has opined that Mr. Robinson is [sic] mentally unstable."); Def.'s Reply 2, Doc. No. 61 ("The Plaintiff has not provided support for all her arguments related to Mr. Robinson's alleged mental illness with admissible evidence.").)  I do not agree.

Allstate notes (correctly) that in all the decisions Plaintiff offers addressing the question of whether a mentally ill person can commit an intentional or criminal act, the claims of mental illness were supported by expert opinion evidence.  See, e.g., Germantown Ins. Co. v. Martin, 595 A.2d 1172, 1174 (Pa. Super. Ct. 1991); Erie Ins. Co. v. Heisey, 81 Pa. D. & C.4th 18, 32 (Pa. Com. Pl. 2007).  Yet, I have found no explicit holding that such testimony is a prerequisite to disputing an insured's mental competence.  But see Germantown Ins. Co., 595 A.2d at 1176 ("Once the court moves beyond the clear meaning of the policy and delves into the subjective state of mind or rationality of the actor, it becomes a contest between psychiatric experts . . . .").  Moreover, Plaintiff here offers voluminous hospital records relating to Mr. Robinson's mental state at the time of his involuntary commitment.  (Pl.'s Am. Opp'n to Def.'s Mot. Summ. J., Ex. A., Doc. No. 60.)

Allstate protests that the "health care providers" making the diagnoses and offering the opinions "have not been offered as experts under Fed. R. Civ. P. 26(a)(2)(A)."  (Def.'s Reply 6 (quoting Tenney v. City of Allentown, No. 03-3471, 2004 WL 2755538, at *2 (E.D. Pa. Nov. 30, 2004)).)  Plaintiff apparently intends to introduce at trial the Einstein records and call the physicians who authored them.  Allstate asks me to preclude admission of the records or the physicians' testimony because during discovery Plaintiff failed to identify any expert or medical trial witnesses.  (Def.'s Reply 6 ("Plaintiff did not identify a single expert in her Rule 26 Disclosures"); id. at 7 ("Plaintiff did not identify a single medical witness or expert in response

8

to Allstate's interrogatories.").)

It would appear that the Einstein records (whose authenticity is undisputed) would be admissible at trial. See Fed. R. Evid. 803(4), (6); see also Williams v. Borough of W. Chester, 891 F.2d 458, 471 (3d Cir. 1989) ("Only evidence admissible at trial may be used to test a summary judgment motion."). The testimony of the doctors who authored the records is quite another matter. Evidently, Plaintiff did not identify any medical witnesses she intended to call at trial until she filed her Pretrial Statement—well after the close of discovery. (See Doc. No. 54.) I agree with Allstate that such discovery misconduct could well preclude Plaintiff from calling at trial any of the belatedly identified physician witnesses. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) (upholding exclusion of expert witness when trial counsel failed to comply with pretrial discovery orders); Frederick v. Hanna, No. 05-514, 2007 WL 853480, at *4 (W.D. Pa. Mar. 16, 2007) (excluding from trial witnesses that were identified for the first time in the plaintiffs' pretrial statement). Given that neither Party has disclosed to me the belatedly identified witnesses' anticipated trial testimony, however, I cannot determine if the witnesses could shed any light on the question of Mr. Robinson's ability to formulate intent.

In sum, I will assume, for purposes of deciding Allstate's summary judgment motion, that Plaintiff may rely only upon her husband's medical records. Even assuming the physicians' testimony would otherwise be admissible, because I do not know the substance of that testimony, it will not inform my summary judgment ruling.

**B. The Fire Loss is Not Covered**

Once again, Pennsylvania law requires Plaintiff to show that her fire loss is covered by the subject Allstate Policy. See State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105,

9

111 (3d Cir. 2009); Riehl v. Travelers Ins. Co., 772 F.2d 19, 23 (3d Cir. 1985). She has not made that showing.

The Policy explicitly limits coverage to "sudden and accidental direct physical loss" to Plaintiff's home. (Homeowners Policy 36–39, Doc. No. 46-4.) "Sudden" means unexpected and unintended, and, when joined by the word "accidental," also conveys a "temporal meaning . . . i.e. abruptness or brevity." Lower Paxton Twp. v. U.S. Fid. & Guar. Co., 557 A.2d 393, 402 (Pa. Super. Ct. 1989); see also Simon Wrecking Co., Inc. v. AIU Ins. Co., 530 F. Supp. 2d 706, 712 (E.D. Pa. 2008) (in absence of specialized trade usage, "sudden and accidental" means temporally abrupt and short-lasting). "'Accident' . . . refers to an unexpected and undesirable event occurring unintentionally and [] the key term in the definition of the 'accident' is 'unexpected' which implies a degree of fortuity." Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 292 (Pa. 2007) (citing Kvaerner Metals v. Commercial Union, 908 A.2d 888, 898 (Pa. 2006)); see also Mehlman, 589 F.3d at 111 ("[T]he fortuity of the events in question is the key factor to consider in making that determination."). Finally, damage is not accidental "if [it] was the natural and expected result of the insured's actions." Baumhammers, 938 A.2d at 292.

Here, the fire damage to Plaintiff's home was not sudden or accidental. It is undisputed that, carrying an open flame, Mr. Robinson walked up two flights of stairs and deliberately set fire to his third floor bedroom. The resulting damage was the "natural and expected result" of these actions. See id. Mr. Robinson's repeated statement that he set the fire to destroy his house further confirms that the fire damage was not fortuitous; rather, it was the result planned and intended by Mr. Robinson.

In these circumstances, it is difficult to see how Plaintiff could show that the Policy covers the fire loss. See Gene's Rest., Inc. v. Nationwide Ins. Co., 548 A.2d 246, 247 (Pa. 1988)

10

(incident that was "not an accident but . . . an intentional tort" was not covered by the policy and insurer owed no coverage duty). Plaintiff seeks to meet that burden by arguing: (1) her husband's medical records show that he could not have committed an accidental act (as defined by Pennsylvania law); and (2) from her perspective, the fire and resulting damage were sudden and accidental. See Baumhammers, 938 A.2d at 292 ("[T]he test of whether injury is a result of an accident is to be determined from the viewpoint of the insured and not from the viewpoint of the one that committed the act causing the injury."). I do not agree.

Plaintiff argues that because under Pennsylvania law, "accidental" is synonymous with "unintended," her husband's setting the fire necessarily was accidental because his medical records confirm that he did not have the mental capacity to commit an intentional act. (Pl.'s Am. Opp'n to Def.'s Mot. Summ. J. 1 ("The 'intentional act' which Allstate purports the basis of the denial, was the result of medical issue [sic] suffered by co-insured, [Mr. Robinson,] and was neither intentional nor non-accidental due to the mental state and medical status of Mr. Robinson.").)

Plaintiff's dubious equating of "accidental" and "unintentional" aside, the medical records say nothing about Mr. Robinson's ability to commit an intentional act. Plaintiff thus has not shown that Mr. Robinson's act was unintentional (and thus accidental) and so has not made out a prima facie case that the fire damage is a covered loss. See State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) ("Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage.").

Plaintiff's alternative argument—that from *her* perspective, the fire was accidental—fares no better. She relies entirely on the Pennsylvania Supreme Court's decision in *Donegal Mutual*

11

*Insurance Company v. Baumhammers*. 938 A.2d 286 (Pa. 2007). There, Mr. and Mrs. Baumhammers purchased a homeowners' policy issued by Donegal. Baumhammers, 938 A.2d at 289. In 2000, their son Richard left the insured residence and shot six people (killing five). Id. at 288. The victims' families filed suit in state court, alleging, *inter alia*, that both parents (insureds under the Donegal policy) acted negligently in failing to provide mental health treatment for their son. Id. Donegal sought a declaratory judgment that it was not liable under the homeowners' policy which covered only "accidental" events, not intentional shootings. Id. The Pennsylvania Supreme Court ruled that the shootings were accidental from the Baumhammers' perspective:

> [T]hat injuries caused by intentional conduct are not "accidental" does not absolve an insurer of the duty to defend its insured when the complaint filed against the insured alleges that the intentional conduct **of a third party** was enabled by the negligence of the insured.

Id. at 291 (emphasis added).

*Baumhammers* is not helpful to Plaintiff: here, there is no third party allegation of negligence against the insured for failing to prevent the commission of a wrongful act. Rather, in the instant case the insured himself committed the wrongful act. Accordingly, even under *Baumhammers*, the fire and resulting damage must be viewed from the perspective of the insured: Mr. Robinson. See Allstate Ins. Co. v. Lombardi, 142 F. App'x 549, 551 (3d Cir. 2005) (when the insured was also the tortfeasor, it was necessary to view the event from his perspective).

Moreover, as I have discussed, the Policy explicitly imposes "joint obligations" on Plaintiff and her husband: the acts of one "insured person" are binding upon the other "insured person." (Homeowners Policy 34, 45, Doc. No. 46-4); see also Travelers Home & Marine Ins. Co. v. Stahley, 239 F. Supp. 3d 866, 873 (E.D. Pa. 2017) ("If the language clearly establishes

12

that the obligations of the insureds are joint, then the "prohibited acts of one insured [will] bar all others from recovering."); McAllister v. Millville Mut. Ins. Co., 640 A.2d 1283, 1288–89 (Pa. Super. Ct. 1994) (denying recovery by innocent co-insureds after house was destroyed by a fire intentionally set by the other named insured).

Plaintiff's belief that she found the fire to be "sudden and accidental" thus does not bring the loss within the Policy's coverage. Mr. Robinson—with whom Plaintiff was a joint obligee under the Policy—was also a named insured and the tortfeasor here. From his perspective, the damage from the fire was neither fortuitous nor unexpected.

### C. Alternatively, Plaintiff's Claim is Excluded Because the Loss Resulted from an Insured's Intentional Act

Because Plaintiff has failed to show that the Policy covered her fire loss, the burden does not shift to Allstate to demonstrate that an exclusion applies. I will nonetheless address the exclusion question, which the Parties have fully addressed.

Allstate argues that it has shown that the Policy's "intentional act" exclusion applies. See Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) (in Pennsylvania, "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage"). Under Pennsylvania law, "[a]n insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result." United Servs. Auto. Ass'n v. Elitzky, 517 A.2d 982, 989 (Pa. Super. Ct. 1986). Moreover, "[a]n actor is presumed to intend the natural and expected results of his actions." State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 114 (3d Cir. 2009). Although this definition implies a degree of objectivity, it also requires an examination of the insured's subjective intent: "the exclusionary clause applies only when the insured intends to cause a harm." Elitzky, 517 A.2d at 987; see also Wiley v. State Farm Fire & Cas. Co., 995 F.2d 457,

13

460 (3d Cir. 1993) ("Pennsylvania has adopted a general standard for determining the existence of this specific intent that looks to the insured's actual subjective intent."). Under this subjective standard, the exclusion extends to "injury and damage of the same general type which the insured intended to cause." Elitzky, 517 A.2d at 989; see also Titan Indem. Co. v. Cameron, 77 F. App'x 91, 95 (3d Cir. 2003). "An injury of the same general type . . . is a composite of many factors, including nature or character of the injury, . . . magnitude, . . . location, . . . and other factors." State Farm Fire & Cas. Co. v. Levine, 566 A.2d 318, 320 (Pa. Super. Ct. 1989).

In arguing that Mr. Robinson's act was intentional (and that the resulting fire loss was thus excluded from coverage), Allstate relies in part on Mr. Robinson's repeated statement that he intended to set the fire. (See Phila. Police Dep't, Complaint or Incident Report, Oct. 26, 2015, Doc. No. 46-7 ("[Mr. Robinson] stated to police that he set the fire because 'his house is demonic and needs to be taken down.'").) This evidence—combined with the reports of the fire experts and the statements of Plaintiff herself—is persuasive, especially because, as I have discussed, Plaintiff has produced no evidence respecting Mr. Robinson's purported inability to commit an intentional act. Rather, relying upon the Einstein records, Plaintiff responds that under Pennsylvania law Mr. Robinson was insane when he set the fire, and so, as a matter of Pennsylvania law, could not commit an intentional act.

Plaintiff's contentions trigger several inquiries: 1) how Pennsylvania law defines insanity in insurance disputes; (2) is intentionality different from insanity; and (3) did Mr. Robinson act intentionally in setting fire to his home. I will address each question in turn.

### 1. *The Insanity Standard*

The Pennsylvania Supreme Court has not addressed the mental competence standard applicable in insurance coverage disputes. Relying on the decisions of Pennsylvania's lower

courts, Plaintiff has identified the *M'Naghten* test. See Germantown Ins. Co. v. Martin, 595 A.2d 1172, 1176 (Pa. Super. Ct. 1991).

Allstate refuses to address the applicable test, arguing that Mr. Robinson's mental state is "legally irrelevant" to my exclusion analysis. (See Def.'s Reply 7–8; Def.'s Mot. Summ. J. 26.) Allstate offers no supporting authority, and the Policy itself implicitly suggests that the insured's mental state must be considered in determining whether an intentional loss is excluded from "Dwelling Protection" and "Personal Property Protection." (Compare Homeowners Policy 54, Doc. No. 46-4 (only the Policy's "Family Liability Protection" and "Guest Medical Protection" provisions explicitly state that the intentional act exclusion applies even if "such insured person lacks the mental capacity to govern his or her conduct").)

In these circumstances, I will look to the Superior Court's decision in *Germantown* for guidance. See State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 108 n. 2 (3d Cir. 2009) (in the absence of Pennsylvania Supreme Court authority, I may look to the Superior Court on questions of Pennsylvania law).

The *Germantown* Court held that under Pennsylvania law, the *M'Naghten* standard governs whether a mentally disturbed insured was insane when he committed wrongful acts causing the subject loss. Germantown, 595 A.2d at 1176. The court relied principally on the Pennsylvania Crime Code's definition of insanity, which restates the *M'Naghten* rule:

> [A]t the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

Id. at 1176 n.2 (quoting 18 Pa. Cons. Stat. § 315).

I agree with Plaintiff. I predict that the Pennsylvania Supreme Court will adopt the reasoning of the *Germantown* Court and recognize the *M'Naghten* standard in coverage disputes.

15

See Commonwealth v. Andre, 2011 PA Super 65, 17 A.3d 951, 959 (Pa. Super. Ct. 2011) (under *M'Naghten*, an individual is insane if he suffers from: (1) cognitive incapacity, precluding him from knowing the nature and quality of his act; or (2) moral incapacity, precluding him from understanding that what he was doing was wrong); see also Clark v. Arizona, 548 U.S. 735, 747 (2006).

### 2. *Insanity and Intentionality*

Since *Germantown*, Pennsylvania courts have ruled inconsistently respecting whether an insured's mental illness can preclude a finding of intent. Compare Kobsic v. Erie Ins. Co., No. 08-3323, 2009 WL 1278487, at *56 (Pa. Com. Pl. Mar. 13, 2009) (possible insanity is relevant to determining intent, and *M'Naghten* is the "appropriate standard to determine mental incapacity"), and Nationwide Ins. Co. v. Curran, No. 887-98, 2001 WL 35923662 (Pa. Com. Pl. June 11, 2001) (applying *M'Naghten* and concluding that the insured was not acting intentionally due to his legal insanity), with Erie Ins. Co. v. Heisey, 81 Pa. D. & C.4th 18, 32 (Pa. Com. Pl. 2007) (disagreeing "with [] the premise . . . that a mental illness can negate intent), and Donegal Mut. Ins. Co. v. Baumhammers, 2006 PA Super 32, ¶ 67, 893 A.2d 797, 821–823 (Pa. Super. Ct. 2006), aff'd in part, rev'd in part, 938 A.2d 286 (Pa. 2007) ("[P]sychiatric testimony may not be used to suggest that [the insured's] acts were unintentional.").

Although I may try to predict how the Pennsylvania Supreme Court will resolve these inconsistencies, I may not resolve them. See Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45–46 (3d Cir. 2009) ("In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case.").

Under *M'Naghten's* moral incapacity prong, an individual can act intentionally, but

simply not know what he was doing was wrong. Commonwealth v. Andre, 2011 PA Super 65, 17 A.3d 951, 960–961 (Pa. Super. Ct. 2011) (cognitive incapacity can "render a person incapable of forming criminal intent," as it would be "hard to conceive" how a person who did not know what he was doing possessed the *mens rea* to commit a crime; in contrast, moral incapacity can "override the element of *mens rea*" because an individual may have the necessary *mens rea* when he "knows what he . . . is doing, but does not know that it is wrong").

Numerous state courts have thus held that an individual who understands the nature and quality of his acts (the first *M'Naghten* prong) can commit an intentional act even if he cannot understand that the act is wrong (the second *M'Naghten* prong). See, e.g., Johnson v. Ins. Co. of N. Am., 350 S.E.2d 616, 620 (Va. 1986) (insured's act is "intentional" within meaning of the exclusion when he "understood the physical nature and consequences of his conduct, and had the purpose and volition to cause the injury, although he was mentally incapable of distinguishing between right and wrong"); Mun. Mut. Ins. Co. of W. Virginia v. Mangus, 443 S.E.2d 455, 457 (W. Va. 1994) (same); Prasad v. Allstate Ins. Co., 644 So. 2d 992, 995 (Fla. 1994) (same); Shelter Mut. Ins. Co. v. Williams, 804 P.2d 1374, 1382 (Kan. 1991) (same); see also Rajspic v. Nationwide Mut. Ins. Co., 718 P.2d 1167, 1170 (Idaho 1986) (it "is possible that an otherwise insane person may have sufficient capacity to understand and contemplate the nature and consequences of her actions"); Econ. Preferred Ins. Co. v. Mass, 497 N.W.2d 6, 11 (Neb. 1993) (same); Mallin v. Farmers Ins. Exch., 839 P.2d 105, 108 (Nev. 1992) (same); Auto-Owners Ins. Co. v. Churchman, 489 N.W.2d 431, 436 (Mich. 1992) (same); Colonial Life & Acc. Ins. Co. v. Wagner, 380 S.W.2d 224, 227 (Ky. 1964) (same).

I predict that, like these courts, the Pennsylvania Supreme Court will rule that an individual who meets *M'Naghten's* second prong of moral incapacity can still commit an

17

intentional act, provided he understands the nature and quality of his acts.

### 3. *The Undisputed Evidence Confirms that Mr. Robinson Acted Intentionally*

The distinction between *M'Naghten's* first prong (cognitive incapacity) and second prong (moral incapacity) is critical here, given the applicable subjective intent inquiry: coverage is excluded only if an insured is capable of intending to commit the harm that that caused the damage at issue. United Servs. Auto. Ass'n v. Elitzky, 517 A.2d 982, 987 (Pa. Super. Ct. 1986) ("Pennsylvania law is clear on at least one of the issues involved. In our state, the exclusionary clause applies only when the insured intends to cause a harm.").

Accordingly, the dispositive inquiry under *M'Naghten* is whether, when he set the fire, Mr. Robinson "was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing." Germantown Ins. Co. v. Martin, 595 A.2d 1172, 1176 n.2 (Pa. Super. Ct. 1991) (quoting 18 Pa. Cons. Stat. § 315). Allstate offers undisputed evidence that Mr. Robinson carried an open flame to the third floor of his home and set his bedroom on fire, later acknowledging that he "want[ed] to burn [his] house." (Def.'s Mot. Summ. J. 6–10; Pl.'s Am. Opp'n to Def.'s Mot. Summ. J., Ex. A. 81, Doc. No. 60-5.) Case law suggests that this is sufficient to meet Allstate's burden of showing that the intentional act exclusion applies.

In *Germantown*, where the insured went on a shooting spree, the court found that the insured "brought about the harm he intended" when he "chose an automatic handgun, brought extra ammunition, drove to the right house, approached without incident and shot repeatedly each person." Germantown Ins. Co., 595 A.2d at 1175–1176. In *Mehlman*, where an intoxicated insured shot his victim, the Third Circuit, relying upon *Germantown,* determined that the insured was "functioning precisely as he intended" because he walked to the victim's house, repeatedly

tried to shoot the victim, and had the ability to carry out these attempts. State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 114–15 (3d Cir. 2009).

As in *Germantown*, that Mr. Robinson's actions may have been "senseless, irrational and incomprehensible . . . has no bearing on determining coverage under the policy." 595 A.2d at 1176. His actions were intentional under Pennsylvania law.

In sum, I conclude that Allstate has met its burden: it has shown that because Mr. Robinson set the fire intentionally, the resulting fire loss is excluded from coverage. That conclusion is reinforced by Plaintiff's failure to offer any evidence, medical or otherwise, that Mr. Robinson was unable to commit an intentional act.

## VI. CONCLUSION

An insured cannot recover from her carrier under a homeowners' policy when her co-insured intentionally sets fire to their home. Here, the undisputed evidence shows that: (1) the fire damage to Plaintiff's home is not covered by the Allstate Policy; and (2) the damage is excluded from coverage because Mr. Robinson intentionally set the fire. Accordingly, I will grant summary judgment in Allstate's favor on Plaintiff's remaining claim for breach of contract.

In light of my decision, I need not address Allstate's contention that coverage is excluded because Mr. Robinson acted criminally.

An appropriate Order follows.

*/s/ Paul S. Diamond*
_____

January 24, 2018                                                                            Paul S. Diamond, J.